**FIRST NAT. BANK OF PARIS et al. v. LYON–GRAY LUMBER CO. et al.**
(No. 1702.)

(Court of Civil Appeals of Texas. Texarkana. March 22, 1917. Rehearing Denied April 26, 1917.)

1. MECHANICS' LIENS ⬥⟶108—RIGHT TO LIEN —CONTRACTOR'S MATERIALMEN.
Const. art. 16, § 37, giving materialmen liens on buildings, and articles made or repaired by them, or for material furnished, is inapplicable to one furnishing material to a contractor.
[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 140, 141.]

2. MECHANICS' LIENS ⬥⟶5—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS.
A constitutional provision creating involuntary liens is not entitled to liberal construction, and the claimant must bring himself within its clear intent.
[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 3, 5.]

3. MECHANICS' LIENS ⬥⟶118—PROCEEDINGS— NECESSITY OF NOTICE.
Under Rev. St. arts. 5621, 5623, giving materialmen mechanics' liens, and requiring the giving of notice to the owner and filing with county clerk, the provisions regarding notice are mandatory.
[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 161.]

4. MECHANICS' LIENS ⬥⟶113(2) — AMOUNT — LIMITATION.
A contractor's materialman is entitled to a mechanic's lien only to the amount that the owner owed the contractor when the materialman notified him that material was being furnished pursuant to Rev. St. art. 5623.
[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 148.]

5. FIXTURES ⬥⟶9—CONTRACTOR'S INCORPORATION OF ELEVATOR IN BUILDING—RIGHT OF MORTGAGEE AGAINST OWNER.
Where the seller retained an unrecorded chattel mortgage on an elevator furnished the contractor, which was incorporated in a building he was constructing under a contract, and the owner of the building completed it upon the contractor's default, the mortgagee could not recover the elevator or its purchase price from such owner.

6. MECHANICS' LIENS ⬥⟶111(1) — MATERIALMEN — INSTALLMENTS DUE CONTRACTOR — AMOUNT OF LIABILITY.
A statutory provision limiting the owner's liability on mechanic's lien claims to the contract price does not prevent the materialman from enforcing a lien on installments due the contractor, although nothing was due him when the building was completed, and the owner had expended more than the contract price in finishing the work after the contractor quit.
[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 144.]

---

⬥⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

7. MECHANICS' LIENS ⬅315 — INDEMNITY
AGAINST LIEN—LIABILITY ON BOND.
　Where a contractor's surety guaranteed the
owner against mechanics' liens, the surety is
liable, although the owner made payments to the
contractor with knowledge of outstanding, unpaid claims.

[Ed. Note.—For other cases, see Mechanics'
Liens, Cent. Dig. § 658.]

Appeal from District Court, Lamar County; A. P. Dohoney, Judge.

Mechanic's lien action by the Lyon-Gray Lumber Company against the First National Bank of Paris and J. T. Finn, in which various parties intervened, and in which the United States Fidelity & Guaranty Company was made a party defendant. From a judgment fixing the rights of the various parties, the First National Bank of Paris, the United States Fidelity & Guaranty Company, and certain lien claimants appeal. Affirmed as modified.

Crane & Crane and Seay & Seay, all of Dallas, Hunt, Myer & Teagle and John Charles Harris, all of Houston, and Burdett, Connor & Dailey, Park, Moore & Hardison, and Long & Wortham, all of Paris, for appellants. Harris & Harris, of Houston, and Head, Dillard, Smith, Maxey & Head, of Sherman, for appellees.

HODGES, J. On the 18th day of February, 1914, the First National Bank of Paris, Tex., entered into a contract with J. T. Finn for the construction of a six-story building on a lot owned by the bank. Finn was to furnish the necessary labor and material, and to receive a consideration of $111,231.-63. The contract provided that the bank should have the privilege of adding a full basement at a further cost of $7,200. By the addition of the basement, which was afterwards called for, and some other extra features agreed upon, the contract price of the structure when completed would have amounted to the sum of $122,493.04. The contract also provided that payments were to be made to Finn in semimonthly installments to the extent of 80 per cent. of the value of the labor and material put into the building, upon estimates furnished by the supervising architect. In order to secure the faithful performance of this contract, Finn executed a bond in the sum of $55,615.81, with the United States Fidelity & Guaranty Company as surety. The conditions of this bond were that Finn, the contractor, would faithfully and satisfactorily construct the building in accordance with the plans and specifications, and would hold the bank harmless against all claims for labor performed or material furnished, and against all claims and demands of any person that might arise directly or indirectly from the prosecution of the work. Finn began the construction of the building about March 1, 1914, and continued till February 9, 1915, when he signified to the bank his inability to complete his contract. The bank then, acting under a clause of its contract which authorized it to do so, took charge of the work of construction and completed the building according to the specifications, at an additional cost of $21,050.38. Prior to the abandonment of the contract by Finn the bank had paid him, on estimates furnished by the architect and for material furnished by Finn's account with the consent of his surety, the sum of $116,-422.34, of which $18,637.21 was a part of the reserved fund. These payments, added to the amount expended by the bank in completing the building, made an aggregate of $137,473.72, or $14,979.68 in excess of the contract price.

In January, 1916, the Lyon-Gray Lumber Company, a private corporation, began this suit against the bank and Finn, the contractor, to recover the principal sum of $12,-433.98, and $355.80 as interest, and to foreclose a lien upon the building and lot for material furnished to Finn and used by him in the construction of the building. It was alleged by the Lyon-Gray Lumber Company that due notice had been given to the bank, and an itemized account filed in the office of the county clerk of Lamar county as required by statute. The bank answered, and specially pleaded its contract with Finn for the erection of the building at a stipulated price, the inability of Finn to complete the building, the taking over of the construction by the bank under the terms of the contract, and the completion of the building at the excess over the contract price. A number of other parties who claimed liens by reason of having furnished material to Finn for the construction of the building intervened, among whom were the following, who are parties to this appeal: The Atlanta Terra Cotta Company, H. S. Bettes Hardware Company, the Christopher & Simpson Iron Works Company, W. F. Dulaney & Sons, the Electric Appliance Company, the Gilbert Manufacturing Company, the Ingram Mill Work Company, the Texas Power & Light Company, the Otis Elevator Company, the Texas Glass & Paint Company, the Trussed Concrete Steel Company, the Wichita Falls Brick & Tile Company, and the Lecoutour Bros. Stair Manufacturing Company. The United States Fidelity & Guaranty Company, which will be hereafter referred to as the surety company, was made a party defendant at the instance of the bank. The case was tried before the court without a jury, and judgment rendered against the bank as follows: Judgment in favor of Lyon-Gray Lumber Company for $13,557.16; in favor of E. B. Ingram for $3,790.07; in favor of H. S. Bettes Hardware Company for $300.95; in favor of W. F. Dulaney & Sons for $781.35; and in favor of the Christopher & Simpson Iron Works Company of $396.15. In each instance there

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

was a foreclosure of the lien upon the property. The two parties last mentioned secure judgments for only a part of their claims. Judgment was rendered in favor of the bank against all of the other parties intervening and claiming liens for labor and material furnished. Judgment was also rendered in favor of the bank over against the surety company for the sum of $14,979.68 and for the amount awarded against the bank in favor of the materialmen above referred to. Appeals have been perfected by the surety company, the bank, and all the lien claimants who failed to obtain judgment for the amount sued for.

In addition to the facts previously stated, we gather the following from the findings filed by the trial court: Under the terms of a verbal agreement with Finn, the Lyon-Gray Lumber Company sold him material used in the construction of the bank building. Those sales and deliveries were upon different dates between March 1, 1914, and November 9th following. Notices were served upon the officers of the bank as the material was delivered to Finn; and on the 28th of January, 1915, the Lyon-Gray Lumber Company filed in the office of the county clerk of Lamar county an itemized account of its claim as required by statute. There was then due it from the contractor the sum of $12,789.78, including some accrued interest. On November 17, 1914, Finn gave the Lyon-Gray Lumber Company an order upon the bank for the payment of the sum of $12,656.-28, that being the amount then due, and directed that it be paid as follows: $4,656.28 out of the estimate due December 1st; $4,000 out of the estimate due December 15th; and $4,000 out of the estimate due January 1, 1915. ·This order was presented to the cashier of the bank and filed by him, but was not formally accepted. ·After the delivery of that order the bank paid Finn $11,785.13, none of which was a part of its 20 per cent. reserved fund. From March 28, 1914, to December 30th following the bank paid to Finn, upon estimates furnished at different times by the architect, the aggregate sum of $97,785.13. On the several dates when material was delivered to Finn by the lumber company and notice served on the bank it had in its hands due Finn, under the terms of the contract, funds considerably in excess of the claim held by the Lyon-Gray Lumber Company.

W. F. Dulaney & Sons sold to Finn, between September 7, 1914, and November 25th following, hardware amounting to the sum of $5,352.57; but notice of the sales was not given to the bank till December 17, 1914. Between December 17th and 29th of the same year other material was sold to Finn by Dulaney & Sons amounting to about $350, and notice thereof given to the bank. Christopher & Simpson Iron Works Company sold Finn material between the dates of September 3, 1914, and December 22d following,

amounting to $2,944.77, and on the last date above mentioned a written notice was served upon the bank. At the time notices were served by W. F. Dulaney & Sons and the Christopher & Simpson Iron Works Company the bank had in its hands and due Finn the sum of $1,177.50. Both of the above-named creditors filed their accounts in the office of the county clerk within the time prescribed by the statute. E. B. Ingram sold to Finn material aggregating $3,790.07. H. S. Bettes Hardware Company sold· him material amounting to $300.95. Each of these last-named creditors gave timely notice to the bank, but failed to file their accounts in the office of the county clerk. Some ·of the remaining parties to this appeal failed to comply with any of the provisions of the statute, and others gave notice at a time when there were no funds in the hands of the bank due Finn under the terms of his contract.

It appears from the conclusions of law filed by the trial court that the judgment rendered in favor of the Lyon-Gray Lumber Company is based upon a finding that the lumber company had fully complied with all the statutory requirements for fixing and securing its lien upon the building at a time when there were funds in the hands of the bank due Finn in excess of the claim of the lumber company; that the judgments in favor of W. F. Dulaney & Sons and of the Christopher & Simpson Iron Works Company for a part only of the sums claimed by them were thus limited, because only $1,177.-50 were in the hands of the bank at the time it was served with notice by those claimants. It further appears that·the judgments in favor of H. S. Bettes Hardware Company and E. B. Ingram were based upon the conclusion that compliance with the statute as to filing itemized accounts in the office of the county clerk was not required in order to fix and secure their liens.

Most of the assignments of error presented by the parties claiming liens upon the building for material furnished may be disposed of by deciding the following questions of law: (1) Did those who sold to Finn, the contractor, material used by him in the construction of the bank's building, have materialmen's liens under the provisions of the Constitution? (2) Were those claimants required to comply with all the provisions of the statute as to giving notice to the owner and filing itemized accounts in the office of the county clerk in order to fix and secure liens against the building?

The lack of harmony in the rulings heretofore made by the courts of this state in analogous cases has enhanced the inherent difficulties of answering those questions. The case of Bassett v. Mills, 89 Tex. 162, 34 S. W. 93, involved the right of one who had furnished material to a subcontractor to claim a lien upon the lot on which the building con-

structed stood. The Supreme Court held that such a lien was given by the act of 1899 then in force. It was stated in the opinion that the language of the Constitution was broad enough to include as lienholders those who held claims for material furnished to a subcontractor, as well as claims for material furnished to the original contractor. We have not found any reiteration of that holding by the Supreme Court, or any decision by it in which this case is cited as authority upon that proposition.

Berry v. McAdams, 93 Tex. 431, 55 S. W. 1112, was a suit by McAdams, who had furnished lumber to Berry, the contractor, to construct a building for Housewright, Swayze & Co. McAdams had given the owners prompt verbal notice of his claim, and had complied with other statutory requirements. The Court of Civil Appeals, being in doubt as to the proper determination of the questions of law involved, due to conflicting rulings by other courts, certified to the Supreme Court the following questions: (1) Did McAdams have a lien under the terms of the Constitution which could not be defeated by a settlement between Berry, the contractor, and the owners after they received notice of McAdams' claim? (2) Did the fact that McAdams had no contract with the owners prevent him from asserting such lien? (3) If the lien existed, was it subject to the right of the owners, after actual notice of the claim, to settle with Berry, and thus defeat the lien before the expiration of the time allowed by statute for filing and recording the account and giving notice in writing?

The Supreme Court answered that the giving of written notice as required by statute was an indispensable requirement for fixing the lien. In the course of the opinion Justice Brown said:

"The appellant (Berry) claims that the Constitution gives no lien to persons who do not contract with the owner of the property. On the other hand, it is insisted by appellee that a lien is given by the Constitution in favor of all classes of materialmen and laborers, which attaches independently of any statutory provisions. That question was decided, as to claims of subcontractors, in Horam v. Frank, 51 Tex. 401, with which there is apparent conflict in the utterances of later cases; but it is not necessary for us to decide the question."

Strang v. Pray, 89 Tex. 525, 35 S. W. 1054, was a suit against an owner by the original contractor for the balance due upon the contract price. The contractor had not complied in any respect with the statutory requirements except in bringing his suit within four months after the indebtedness accrued. The Supreme Court held that the contractor's lien attached under the terms of the Constitution, and was not lost by his failure to record the contract, or bill of particulars, as required by the statute. From this ruling it follows that liens created by the Constitution are complete without reference to the statute, and that the statutory requirements as to notice and the filing of contracts and itemized ac-

counts in the office of the county clerk need not be observed where no rights of third parties are involved. If notice to third parties is the only purpose which those statutory requirements are intended to serve in the enforcement of constitutional liens, the failure to observe them cannot be invoked by one who has actual notice of all the facts. In Berry v. McAdams the owner had actual notice of the unpaid claim of a creditor who had supplied the contractor with material; but the court held that actual notice was, under that state of facts, not sufficient, and the statute must be complied with. That ruling, when considered in connection with the language used in Strang v. Pray, appears to support the conclusion that the claimant in Berry v. McAdams had only a statutory lien; for if one holder of a constitutional lien may disregard the statute, it is difficult to see why another should not exercise the same privilege under similar conditions.

If the case of Bassett v. Mills had established a precedent which the Supreme Court thereafter fully approved, the question certified in Berry v. McAdams presented a seasonable opportunity for such a holding. The failure of Justice Brown to cite that case instead of one apparently in conflict with it, and the reference to the question as still unsettled, indicates either a disinclination to follow the ruling announced in Bassett v. Mills or that it was not regarded as authority upon that proposition. On the other hand, in the case of Beilharz v. Illingsworth, 62 Tex. Civ. App. 647, 132 S. W. 106, decided by the Court of Civil Appeals of the Fifth District, in which a writ of error was refused, and the case of Texas Builders' Supply Co. v. Beaumont Construction Co., 150 S. W. 770, it is directly held that one who furnishes material to a contractor is entitled to a lien under the terms of the Constitution, and that full compliance with the statutory requirement in filing an itemized account in the office of the county clerk was not necessary where the rights of subsequent purchasers were not involved. But in the case of First Baptist Church v. Carlton Lbr. Co., 173 S. W. 1179, a contrary ruling was announced by this court, and a writ of error was refused by the Supreme Court. Other conflicting cases might be referred to, but these, we think, are sufficient to disclose the discord among the courts. Under these circumstances, we therefore feel at liberty to discuss the application of the Constitution to claims of this character as, in some respects, an original question.

[1, 2] Section 37 of article 16 of that instrument is as follows:

"Mechanics, artisans and materialmen, of every class, shall have a lien upon the buildings and articles made or repaired by them, for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens."

Omitting all superfluous language regarding materialmen, the section quoted would read:

"Materialmen of every class shall have a lien upon the buildings and articles made or repaired by them for the value of the material furnished therefor."

The first and logical inquiry is, who is a materialman within the meaning of the language quoted? Is it the contractor who owns and controls the material at the time it is appropriated in the construction of the building made or repaired, or does the term also include one who sells to the contractor material which is subsequently used for that purpose? A contractor who, in compliance with his obligation to do so, buys and furnishes the necessary material used in a building which he has agreed to construct for a fixed price, is, undoubtedly, a furnisher of material within the meaning of the Constitution, and is entitled to the lien there provided for. Strang v. Pray, supra. If the material then belongs to the contractor, it is of no importance that it has not been paid for, as that fact alone cannot affect his title or dominion over the property. It is the ownership of the material at the time it is incorporated into the building which makes the contractor a materialman, and the debt created by such appropriation is that which the Constitution intended to secure by the lien given. The dealers from whom the contractor purchases the material which he thus applies do not occupy that legal status. By selling to the contractor they parted with whatever title they held, and conferred upon the contractor an unrestricted dominion over the property. He might then use it for any purpose he saw proper, or sell it again without making any use of it. Such dealers are under no obligation to the owner to furnish any material, and could not be held responsible by him for a failure to do so or for any defect in that which they delivered to the contractor. The legal status they occupy toward the building or its owner is radically different from that of the contractor who has engaged to furnish material. If that legal relation was required in order to constitute the contractor a materialman within the meaning of the Constitution, then one who does not occupy that status, or one substantially the same, is not entitled to the rights which attend that relation. Some assistance may be obtained in the solution of this question by an inquiry into the purposes for which the liens mentioned in the Constitution are created. Manifestly it was to secure the payment of a class of debts for which the owner of the property incumbered might justly be held responsible. Looking to the language of the Constitution alone, the presumption would be that the debts contemplated are those which originate from the furnishing or appropriation of the material in the process of construction or repair. To such a debt the lien becomes an incident. The two originate simultaneously, grow out of the same transaction, and expire at the same moment. But no such conditions attend the debt of the contractor incurred in the purchase of material from a dealer; for there can be no semblance of a lien as long as the material remains isolated and unincorporated in the building, and there is no obligation on the part of the contractor to make that use of it. The existence of the lien in such an instance, therefore, must depend, not upon any contract, but upon the election of the contractor to make that particular use of his material. Moreover, if such dealer acquires a lien by this appropriation of the property, then we have two possible liens, securing two separate and distinct debts, resulting from the sale and appropriation of the same material. If there may be two distinct liens resulting from the successive ownership of the same material, why is it not possible to have three, and even more? The statute gives a lien to those who furnish material under or by virtue of a contract with either the owner or the contractor. But the language of the Constitution is not so broad. The right of one who supplied material to a contractor to claim a constitutional lien depends solely upon an enlarged use of the word "furnished." If it is proper to say the material is *furnished* when delivered to the contractor, the lien follows. But if it is not furnished till appropriated in the building, then the dealer is not a *furnisher* who may claim the lien. The fact that the dealer's lien must depend upon such appropriation tends to make that transaction the legal test of whether or not a thing has been furnished. If there is no furnishing till such appropriation occurs, it logically follows that the party who then owns the property and controls the appropriation is the one who is the *furnisher* or materialman.

The use of the words "every class," in referring to mechanics, artisans, and materialmen in whose favor liens are created, has been relied on as enlarging the beneficiaries mentioned so as to include some who would not otherwise fall within that description. Those words refer to mechanics and artisans as well as to materialmen. It is well known that mechanics and artisans are usually classified according to the character of material they handle or the work they perform. They may be divided into carpenters, brickmasons, plumbers, painters, etc., each performing a distinct class of service on buildings. The words "every class" do not make any workman a beneficiary of the lien who cannot, according to the accepted standards, be properly classed as a mechanic or an artisan. The same rule of construction may with equal propriety be adopted in considering the application of those words to materialmen. If these may be separated into distinct classes, the grouping should be arranged, not by their status as creditors, but by the character of the material which they furnish. One may furnish lumber, another brick or stone, a third steel

or iron, and a fourth paints and varnishes. The words "every class" cannot include any one who is not a *furnisher* of some character of material. They are used in order to make it certain that all who do *furnish any* character of material are included.

There is other language in this article of the Constitution which appears to harmonize with these conclusions. It is said that the parties referred to "shall have a lien upon buildings and articles made or repaired by them." By dropping the pronoun "them," the meaning of this extract would not be substantially altered by reading it thus: "shall have a lien upon buildings and articles made or ·repaired by such mechanics, artisans, or materialmen." This clearly restricts the liens in favor of mechanics and artisans to those buildings or articles with which they have some contractual connection. There is no good reason why a similar restriction should not apply to the materialmen who are favored with such liens. It is true that a materialman is not eo nomine either a builder or a repairer, but a builder or repairer may by his contract become a materialman as to the building or article which he undertakes to make or repair. One who merely sells material to a contractor, to be used by him in the making or repairing of the building or article sought to be incumbered, takes no part in that work himself, has no contractual relation to it, and therefore does not come within that interpretation of the meaning of the Constitution. There is no occasion for holding that those who sell material to a contractor are entitled to liens, in order to give proper effect to the language of the Constitution. Its terms and purposes may be fully satisfied by limiting the liens to those who own and control the material when it passes directly to the owner of the incumbered property or by incorporation into his building. Provisions by which involuntary liens are created have no special claim on the liberality of court in applying the general rules of construction. One who lays claim to such a lien must bring himself within the terms, or the clear intention, of the law relied on.

Counsel for some of the dealers who sold material to Finn, the contractor, argue with much force that a lien created by the Constitution cannot be defeated by any contract to which such lienholder is not a party. They contend that such liens are incumbrances which continue in force till released or till the debts they secure are satisfied. They insist that it is immaterial that the owner owes the contractor no part of the contract price; that the lien exists independently of that condition. If this argument is correct, it furnishes a reason which forbids a too liberal extension of the constitutional lien; for if one who sells material to a contractor may acquire such a paramount right, then the owner would in every instance be at the mercy of those who extend credit to the contractor.

The practical abridgment of the right of contract which such conditions would make possible is enough to justify a construction which confines the liens to those who cannot make so disastrous a use of them.

For the reasons stated, we feel disposed to adhere to the ruling made in the case of First Baptist Church v. Carlton Lumber Company, before referred to. We therefore conclude that none of the parties who sold material to Finn acquired a lien under the terms of the Constitution, but that they must rely upon a compliance with the provisions of the statute. Article 5621 of the Revised Civil Statutes provides for a lien in favor of those who furnish material for a building under and by virtue of a contract with the owner, his agent, or the contractor. Article 5623 provides, as a condition for fixing and securing such liens that the party furnishing the material to a contractor shall file an itemized account of his claim in the office of the county clerk within 90 days after the indebtedness shall have accrued. It also requires those who furnish material to a contractor to give written notice to the owner of the building, or his agent, that such material has been furnished. Parties claiming liens under those provisions of the statute must show that they have complied with the foregoing requirements, not only in respect to giving the notice to the owner, but also in filing contracts or itemized accounts in the office of the county clerk. Berry v. McAdams, supra; U. S. & Mex. Trust Co. v. Western Supply Co., 109 S. W. 377; Gilmer v. Wells, 17 Tex. Civ. App. 436, 43 S. W. 1058.

[3, 4] It appears from the facts found by the court that the Lyon-Gray Lumber Company complied with all of the above statutory requirements; that notice had been given at a time when the bank had in its hands funds belonging to Finn more than sufficient to satisfy the claim held by the lumber company. It also appears that W. F. Dulaney & Sons and the Christopher & Simpson Iron Works complied with the terms of the statute. But the court found that at the time they served notice on the bank it had in its hands only $1,177.50 due Finn upon his construction contract. Judgments in favor of those two creditors against the bank were correctly entered in the court below. The failure of the Bettes Hardware Company and E. B. Ingram, for whom similar judgments were rendered, to file their accounts in the office of the county clerk, was sufficient to defeat their claims to liens, and they were not entitled to the judgments recovered by them against the bank.

[5] The Otis Elevator Company is not here asserting a materialman's lien, but is claiming rights under the terms of its contract made with Finn at the time it sold him the elevators furnished. It insists that it is now entitled to a return of those elevators or to payment of the balance due upon its claim for their purchase price. The facts show

that in May, 1914, the Otis Elevator Company entered into a contract with Finn whereby it agreed, in consideration of the sum of $7,000, to furnish and install two elevators in the bank building. This contract provided, among other things, that the Otis Elevator Company was to retain title to and possession of all machinery, implements, and apparatus furnished by it. Payment was to be made in specified installments. This contract was not filed for record in the office of the county clerk of Lamar county until March 31, 1915. It was then that the bank had its first notice of the lien now claimed by the elevator company. On the 9th day of February, 1915, at the time Finn abandoned his contract, the elevator company had not fully completed the installation of the elevators. They were, however, in place, and the machinery was firmly fixed and bolted in place so as to become a part of the realty. The elevators had been included in all estimates theretofore furnished by the architect, and payments to Finn were made upon those estimates. After Finn abandoned his contract and turned over the building for completion to the bank, the latter requested the elevator company to finish the installation of the elevators, but it refused to do so unless the bank would pay the balance due on the purchase price. This the bank declined to do.

The contract of the elevator company with Finn was merely a mortgage given to secure the payment of the contract price of the elevators. The position of the bank at the time it took over the building was substantially that of a purchaser without notice. The elevators had been sold to Finn and were incorporated into and became a part of the bank's building under the terms of its original contract with Finn. By such incorporation, whatever rights Finn had in the elevators as personalty passed to the bank, just as did the lumber, brick, and other material of which the building was composed. Counsel for the elevator company argue that under its contract with Finn the elevators retained their character as personalty, although in fact attached to the building; that the transformation of personalty into realty is controlled by the intention of the parties. That proposition may be correct when all the parties interested concur in the contract of severance; but in this instance the bank, who owned the realty to which the elevators were attached, and who became the assignor of the elevators by the attachment, was not a party to that compact, and its rights cannot be affected by the agreement between Finn and the elevator company. We think the court correctly disposed of that claim. Peck-Hammond Co. v. Walnut Ridge Dist., 93 Ark. 77, 123 S. W. 771; Allis Chalmers Co. v. City of Atlanta, 164 Iowa, 8, 144 N. W. 346, 52 L. R. A. (N. S.) 561, Ann. Cas. 1916D, 910.

[6] It is contended by the bank and the United States Fidelity & Guaranty Company that, under the statute which provides that the owner shall in no event be liable to lienholders for more than the contract price of the building, the bank could not be held responsible upon any of the claims for which judgment has been rendered against it. This proposition is based upon the finding of the court that nothing was due the contractor after the building was finished, and that the bank had expended $14,979.68 in excess of the contract price in its completion. The record shows that, under the terms of his contract with the bank, Finn was entitled to be paid in semimonthly installments during the progress of construction, to the extent of 80 per cent. of the value of the labor and material put into the building. These payments were to be made upon estimates furnished by the architect. When those estimates were furnished at the intervals provided for, a definite portion of the contract price became due and payable to Finn. This the bank had no legal right to withhold. The rule is well settled that, when a specified sum of money is payable in installments, each installment as it becomes due constitutes a distinct cause of action for which suit may be maintained when payment is refused. Racke v. Br. Asso., 17 Tex. Civ. App. 167, 42 S. W. 774; Davidson v. Hirsch, 45 Tex. Civ. App. 631, 101 S. W. 269; Lorillard v. Clyde, 122 N. Y. 41, 25 N. E. 292, 19 Am. St. Rep. 470. A creditor for material furnished to Finn could, by a compliance with the statutory requirements, subject such of the installments as were due to the payment of his debt. The possibility that Finn might thereafter fail in the completion of his contract, and the bank be compelled to take over and finish the building at a cost in excess of the contract price, did not affect Finn's right to demand payment of the installments as they became due. As long as Finn was not in default he had a right to those payments as they accrued, and to this right a diligent creditor might become substituted by a compliance with the statutory requirements. The rights of the Lyon-Gray Lumber Company, W. F. Dulaney & Sons, and Christopher & Simpson Iron Works Company must be determined by the conditions existing at the time they fixed their liens. If there was then any part of the contract price due to Finn, their right to have it applied to the payment of their claims could not be defeated by the bank's withholding payment in violation of its contract with Finn. Baumgarten v. Mauer, 60 S. W. 451; Lonergan v. Trust Co., 101 Tex. 80, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 129 Am. St. Rep. 803.

[7] The surety company contends that it is not liable on its bond for the amount of the judgments rendered against the bank on the claims of the materialmen, because the facts show that the bank had notice of these claims at a time when it might have protected itself against them; that, instead of pursuing the proper course, it continued to make payments

to Finn. It is insisted that such conduct on the part of the bank absolved the surety company from its obligation to indemnify the bank against that class of claims. The liability of the surety company must be determined by the provisions of its contract of indemnity. By that agreement it not only guaranteed that Finn would furnish the labor and material and construct the building according to certain plans and specifications, but that it would indemnify and hold harmless the bank against all claims for labor done or performed and material furnished, and against all other claims or demands whatsoever made by any person, firm, or corporation against or on account of the work of construction that might arise, directly or indirectly, from the prosecution of the work. It has been definitely determined that written notice to the owner that a creditor for material holds a claim against the contractor is essential to the creation of a lien upon the owner's property to secure the payment of such claim; hence there can never be a lien upon a building in such cases except under conditions where the owner has the opportunity to protect himself by paying the money to the lien claimant instead of to the contractor. It follows, therefore, that no condition can arise where the owner may not protect himself, if he chooses to do so, against any such claims. Hence, if we attach any significance to the conditions of the bond where it undertakes to hold the owner harmless against liens, it can refer only to those which the owner knowingly foregoes his right to settle and trusts their payment to the contractor. If the owner is not protected against that class of claims, then that feature of the bond is of no value whatever. The contractor by his bond expressly bound himself to deliver the building unincumbered by such liens, and the surety company guaranteed that he would perform that undertaking. The contention of the surety company we think is without merit, and the court properly held that it was liable for all sums for which judgment should be rendered against the bank.

[6] Upon the whole case we conclude that the judgments in favor of the Lyon-Gray Lumber Company, W. F. Dulaney & Sons, and the Christopher & Simpson Iron Works Company against the bank should be affirmed, as well as the judgment allowing no recovery by other parties to the suit. We are further of the opinion that the judgment in favor of the Bettes Hardware Company and E. B. Ingram against the bank should be reversed, and judgment here rendered that those parties take nothing by their suit; that the judgment in favor of the bank against the surety company should be so reformed as to limit its recovery to the amount of the judgment awarded against it in favor of the Lyon-Gray

Lumber Company, W. F. Dulaney & Sons, and the Christopher & Simpson Iron Works Company. In all other respects the judgment will be affirmed.